IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE D. KREIDER, | ) | CASE NO. 1:07 CV 1694 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | WILLIAM H. BAUGHMAN, JR. |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## Introduction

This is an action for judicial review of the final decision of the Commissioner of Social Security denying the applications of the plaintiff, Joyce D. Kreider, for disability insurance benefits and supplemental security income.

The Administrative Law Judge ("ALJ"), whose decision became the final decision of the Commissioner, decided that Kreider had severe impairments consisting of eosinophilic gastroenteritis, back disorder, and depression.[1]   The ALJ made the following residual functional capacity finding:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work. Specifically, she can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently.  She is limited to simple, repetitive tasks and low stress

---

[1] Transcript ("Tr.") at 16.

work.  She can occasionally climb, balance, kneel, crouch, crawl and stoop. She needs convenient access to restroom facilities.[2]

Given that residual functional capacity, the ALJ found Kreider capable of performing her past relevant work as a cashier.[3]  He, therefore, found Kreider not under a disability.[4]

Kreider asks for reversal of the Commissioner's decision on the ground that it does not have the support of substantial evidence in the administrative record.  Specifically, Kreider asserts eight issues for decision on judicial review:

> 1. Whether the ALJ erred in not crediting the opinions of the plaintiff's treating sources, and not giving those opinions controlling or deferential weight, and in failing to give "good reasons" for rejecting the opinions of the long-time treating sub-specialists in gastroenterology.
>
> 2. Whether the ALJ erred in relying upon the testimony of a non-examining medical expert (ME) to support his decision to deny benefits.
>
> 3. Whether the ALJ erred in substituting his own unqualified medical opinion for that of qualified medical experts.
>
> 4. Whether the ALJ erred in not calling upon an ME to testify at the plaintiff's second administrative hearing in order to assist in determining plaintiff's onset date.
>
> 5. Whether the ALJ erred in failing to make a specific and thorough credibility determination with regard to the plaintiff's allegations of pain, depression and other nonexertional symptoms.

---

[2] *Id.* at 18.

[3] *Id.* at 22.

[4] *Id.* at 22A.

-2-

6. Whether the ALJ erred in failing to evaluate the plaintiff's complaints of pain and other non-exertional symptoms as required by *Duncan v. Secretary of H.H.S.*, 801 F.2d 847 (6th Cir. 1986).

7. Whether the ALJ erred in relying upon VE testimony that did not take into account the non-exertional impairments included in the ALJ's RFC (*i.e.* limited to simple, repetitive tasks and low stress work, need for convenient access to restroom facilities) in finding that the plaintiff is capable of performing her past work or other jobs cited by the VE.

8. Whether the ALJ erred in relying upon VE testimony that is inconsistent with the DOT and SSR 00-4p, to deny benefits at step 5 of the sequential evaluation.

As a review of the above issues discloses, the first four relate to the ALJ's treatment of the opinions of various physicians, which opinions appear in the administrative record. The fifth and sixth issues relate to the ALJ's credibility finding and his evaluation of Kreider's complaints of pain. The seventh and eighth issues deal with the ALJ's treatment and consideration of vocational expert testimony.

I conclude that although substantial evidence supports the ALJ's residual functional capacity finding, it does not support the findings that Kreider can perform her past relevant work or that a significant number of jobs exists locally and nationally that Kreider could perform. As discussed below, the testimony of the vocational expert was either inconsistent with the *Dictionary of Occupational Titles* or was such that it cannot be determined on this record if his testimony was consistent with that source. I will recommend, therefore, the remand of this case for reconsideration of the finding that Kreider could perform her past relevant work and/or the alternative finding that a significant number of jobs existed locally or nationally that Kreider could perform.

## Analysis

### 1.    Standard of review

The Sixth Circuit in *Buxton v. Halter* reemphasized the standard of review applicable to decisions of the ALJs in disability cases:

> Congress has provided for federal court review of Social Security administrative decisions. 42 U.S.C. § 405(g). However, the scope of review is limited under 42 U.S.C. § 405(g): "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." In other words, on review of the Commissioner's decision that claimant is not totally disabled within the meaning of the Social Security Act, the only issue reviewable by this court is whether the decision is supported by substantial evidence. Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
>
> The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.[5]

I will review the findings of the ALJ at issue here consistent with that deferential standard.  The relevant evidence from the administrative record will be discussed in detail as part of the following analysis.

### 2.    The ALJ's treatment of the opinions of medical sources

Kreider suffered flare ups from eosinophilic colitis, a rare gastrointestinal condition. She maintains that these flare ups occurred with sufficient frequency and severity as to render her disabled.  Kreider argues that in adopting a residual functional capacity finding that

---

[5] *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted).

would acknowledge this condition with the sole accommodation of convenient access to a bathroom, the ALJ concentrated on her "good days," ignored her "bad days," and improperly evaluated the opinions of her treating gastroenterologists.  Further, she submits that by acknowledging only minimal mental limitations, the ALJ improperly weighed the opinion of an examining psychiatrist, June Rees, M.D.

### a.      The treating gastroenterologists

The administrative record contains the treatment notes and opinions of three treating gastroenterologists – Monica Ray, M.D.; Doris Meyers, D.O.; and Elizabeth Mcintyre, M.D. Kreider correctly points out that the regulations require the Commissioner "to make the disability determination based upon a longitudinal picture of her overall degree of functional limitation."[6] In determining whether the ALJ properly assessed Kreider's residual functional capacity, I have conducted an extensive review of the treatment notes and opinions of those physicians, which I relate immediately below.

### (1)      Monica Ray, M.D.

Dr. Ray's treatment notes and opinions are critical to the assessment of Kreider's limitations.  Kreider had an extensive treating relationship with Dr. Ray that began in October of 1999 and extended continuously until September of 2004.  Although a change of insurance forced Kreider to switch to another gastroenterologist in 2004, she returned to Dr. Ray for a follow-up assessment in January of 2006.  Kreider's successor

---

[6] 20 C.F.R. §§ 404.1520a(c)(1) and 416.920a(c)(1).

gastroenterologists, Drs. Meyers and Mcintyre, relied heavily on the diagnosis made and the course of treatment begun by Dr. Ray.

Kreider first presented to Dr. Ray in late September, 1999, with multiple gastrointestinal complaints, including diarrhea.[7]  An endoscopy revealed marked erosive gastritis but no other abnormalities.[8]  Multiple biopsies disclosed eosinophilic colitis.[9] Dr. Ray began treatment with Prednisone.[10]

By early January of 2002, Kreider showed "marked improvement" on Prednisone, which Dr. Ray continued.[11]  Improvement continued in February of 2002, and Dr. Ray reduced the Prednisone dosage.  In June of 2002, Dr. Ray reported that upper GI symptoms had completely subsided but that some continued Prednisone treatment was necessary.[12]  In November of 2000, Kreider was diagnosed with an ulcer and gastrointestinal bleeding.[13] Dr. Ray treated her with Prevacid, Azulfidine, and Prednisone.[14] By March of 2001, Dr. Ray

---

[7] Tr. at 347.

[8] *Id.*

[9] *Id.*

[10] *Id.* at 348.

[11] *Id.* at 346.

[12] *Id.* at 343.

[13] *Id.* at 336, 339.

[14] *Id.* at 332.

reported that her ulcer was healed, and she began an attempt to wean Kreider off of Prednisone.[15]  By July of 2001, Kreider was off of Prednisone.[16]

There is no documentation of treatment from Dr. Ray until December of 2001, when Dr. Ray started Kreider on a regimen of Remicade infusions.[17]  In August of 2002, Dr. Ray noted that Kreider had shown dramatic improvement in symptoms on Remicade and that her energy was good.[18]  In November of 2002, Dr. Ray again noted that Kreider was feeling fairly well on her Remicade regimen; that her bowel systems were well controlled; and that she was not experiencing any significant diarrhea, rectal bleeding, or abdominal pain.[19]

In January of 2003, Dr. Ray again reported that Kreider was doing well on Remicade.[20]  In June of 2003, Dr. Ray observed that, although Kreider continues to do well on the Remicade regimen, she began feeling some recurrence of symptoms toward the end of her treatment cycle.[21]  She recommended more frequent Remicade infusions.[22]

---

[15] *Id.* at 328.

[16] *Id.* at 327.

[17] *Id.* at 518.  I could find no treatment notes from Dr. Ray between July 8, 2001 and August 1, 2002.  The record contains a letter from Dr. Ray to Kreider's primary care physician, Daniel Hofius, M.D., reporting that Remicade infusions were begun in December of 2001.  *Id.*

[18] *Id.* at 518.

[19] *Id.* at 516.

[20] *Id.* at 513.

[21] *Id.* at 510.

[22] *Id.* at 511.

In June of 2004, Dr. Ray reported that Kreider was still doing fairly well on the Remicade drug regimen, which was then being administered every two months.[23]  Kreider complained of worsening abdominal pain and uncontrollable diarrhea for about a week before each Remicade infusion.[24] Dr. Ray expressed concern that, although Kreider had done very well on the Remicade regimen, she may be about to lose her insurance and not be able to afford the drug.[25]

In this context, and in the June 2004 time period, Dr. Ray completed her residual functional capacity evaluation.[26]   At several points, Dr. Ray noted that Kreider needed medication to keep her disease under control, that she is able to function when the disease is in remission, but that she was then not taking the medication needed to keep her in remission (apparently because of insurance problems).[27]   She rated Kreider capable of low-stress jobs.[28] She placed no specific limitations on sitting, standing, or walking, noting that such limitations depended upon whether or not Kreider was in a flare up.[29] She indicated that Kreider needed ready access to a restroom, that she may need to use the restroom very

---

[23] *Id.* at 562.

[24] *Id.*

[25] *Id.*

[26] *Id.* at 556-60.

[27] *Id.* at 557-58.

[28] *Id.*

[29] *Id.* at 559.

often, but she would be away from her work station not long.[30]  She did not believe that Kreider would need to lie down or rest at unpredicted intervals during the workday.[31]  She estimated that Kreider was likely to be absent from work about once a month.[32]

It appears that Kreider ceased seeing Dr. Ray sometime after June of 2004, apparently because of insurance reasons, and began treatment with Doris Meyers, D.O.  She saw Dr. Ray again in January of 2006 for follow up apparently after Dr. Meyers moved away or retired.[33]  Dr. Ray noted that Dr. Meyers had essentially kept Kreider on the same Remicade regimen.  The transcript indicates that her last Remicade treatment was in August of 2005. After ceasing Remicade treatment, she continued on Purinthol, Azulfidine, and Prevacid.[34] Dr. Ray reported that Kreider was doing well under this course of treatment.[35]  Dr. Ray referred Kreider for follow up to Dr. Elizabeth Mcintyre.[36]

*(2)    Doris Meyers, D.O.*

As stated above, Dr. Meyers became Kreider's treating gastroenterologist sometime in 2004.  She continued Kreider on the same Remicade regimen as prescribed by Dr. Ray.

---

[30] *Id.*

[31] *Id.*

[32] *Id.* at 560.

[33] *Id.* at 671.

[34] *Id.*

[35] *Id.*

[36] *Id.* at 672.

I am able to identify very few documents that can be characterized as treatment notes generated by Dr. Meyers.  Her signature does appear on such records as a request for a colonoscopy in February of 2005,[37] documentation of an endoscopy in the same month,[38] and records of Remicade infusions in 2005.[39]  Dr. Ray provided the most detailed description of the course of treatment under Dr. Meyers in her report of January, 2006.[40]

Dr. Meyers did complete a residual functional capacity assessment in October of 2005.[41]  In that evaluation, she rated Kreider capable of low-stress jobs.[42]  She limited her sitting, standing, and walking to less than two hours in an eight-hour workday.[43]  She also limited Kreider's lifting and carrying to ten pounds occasionally and five pounds frequently.[44]  Finally, she estimated that Kreider would be absent from work more than four times a month.[45]

_____

[37] *Id.* at 633, 642.

[38] *Id.* at 634-41.

[39] *Id.* at 626-31.

[40] *Id.* at 671-72.

[41] *Id.* at 680-83.

[42] *Id.* at 681.

[43] *Id.* at 682.

[44] *Id.*

[45] *Id.* at 683.

-10-

(3)    *Elizabeth Mcintyre, M.D.*

Kreider began treatment with Dr. Mcintyre on referral from Dr. Ray in early 2006.[46]

Dr. Mcintyre's treatment notes consist of those generated during a single visit on March 23, 2006.[47] Although Kreider apparently asked Dr. Mcintyre to resume the Remicade regimen, Dr. Mcintyre did not believe enough evidence existed of an active disease to restart that medication.[48]

Based upon this one examination, Dr. Mcintyre prepared a residual functional capacity assessment.[49] In that evaluation, she recognized that she had seen Kreider only once and was relying on the assessment of Dr. Ray.[50] She stated that she could not estimate any of Kreider's functional limitations in a competitive work situation based upon the single examination.[51] She, therefore, made no attempt to assess Kreider's ability to sit, stand, walk, lift, or carry in a normal workday.[52] Nor did she offer an opinion as to how often Kreider

---

[46] *Id.* at 671-72.

[47] *Id.* at 666-67.

[48] *Id.* at 668.

[49] *Id.* at 662-65.

[50] *Id.* at 663.

[51] *Id.*

[52] *Id.* at 664.

-11-

would be absent from work in a month.[53]  She did offer the observation that Kreider would

be incapable of even low-stress jobs based upon her single interaction with Kreider.[54]

*(4)     Analysis of the opinions of the treating gastroenterologists and of the opinion of
        Frank Cox, M.D., the medical expert*

The critical opinion in evaluating Kreider's residual functional capacity is that of

Dr. Monica Ray, the treating gastroenterologist who managed her care from 1999 through

2004.  The ALJ observed that Dr. Ray's opinion was consistent in part with the residual

functional capacity assessment but contrasted sharply with evidence in the treatment notes

that Kreider was doing well.[55]

In fact, the treatment notes of Dr. Ray do provide the longitudinal view of the patient

called for by the regulations.  As discussed above, those notes document the capable efforts

of Dr. Ray to manage Kreider's disease through various drug regimens.  The objective

medical evidence shows that Dr. Ray's treatment resolved Kreider's peptic ulcer and brought

her colitis under control through Remicade.  As documented by Dr. Ray's follow-up

examination in January of 2006, her successor, Dr. Meyers, continued this regimen.  After

Kreider stopped seeing Dr. Meyers sometime in the fall of 2005, her disease remained under

control despite the termination of Remicade treatments.  As of March of 2006, as noted by

---

[53] *Id.* at 665.

[54] *Id.* at 663.

[55] *Id.* at 21.

-12-

Dr. Mcintyre, there was not enough evidence of active disease to resume the Remicade treatments.

Dr. Ray's assessment done in June of 2004 is, as observed by the ALJ, inconsistent in certain respects with the treatment notes.  Although Dr. Ray repeatedly reported that Kreider's disease was well controlled by Remicade and in remission, she nevertheless reported that Kreider was "severely impaired" when in a flare up.[56]  Otherwise, however, she noted that Kreider was "able to function when her disease was in remission."[57]  Her opinion is qualified by the observation that at the time she was not taking medication needed to keep in remission and was likely to do poorly without such medication.[58]  As the transcript bears out, however, Kreider in fact continued taking Remicade for another fourteen months and did not show signs of a recurrence of active disease as late as March of 2006.  It is reasonable, therefore, to view the reservations expressed by Dr. Ray as colored by her concern at the time of a relapse following a cessation of Remicade.[59]

---

[56] *Id.* at 558.

[57] *Id.*

[58] *Id.*

[59] With respect to each of the gastroenterologists, the ALJ discussed their opinions in detail, assigned weight thereto, and explained his reason for the weight assigned.  His decision, therefore, satisfies the articulation requirements established by the regulations. *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 729-31 (N.D. Ohio 2005).  The issue is not whether the ALJ articulated but rather whether the content of that articulation has the support of substantial evidence.

As for the opinions of Dr. Meyers and Dr. Mcintyre, the ALJ correctly observed that Dr. Meyers's course of treatment is not well documented and her limitations are inconsistent with the evaluation of Dr. Ray, whose attention to and evaluation of Kreider's case both predates and postdates that of Dr. Meyers.  The ALJ appropriately gave the opinion of Dr. Meyers little weight.

Likewise, the ALJ did not err by giving Dr. Mcintyre's assessment little weight.  She admitted that her evaluation was based on a single examination and relied heavily upon the observations of Dr. Ray.  For most categories of limitation, she declined to offer any opinion as to limitations.

Under the substantial evidence standard, I must conclude that a reasonable person could come to the same conclusion as the ALJ that the important evaluation of Dr. Ray was in part consistent with his residual functional capacity finding and to the extent that it was not, her treatment notes paint a different picture.  This is not to say that the record does not contain evidence supportive of Kreider's claim of impairment to the extent of disability.  Where, however, a reasonable person could reach two different conclusions based on the evidence, the conclusion reached by the Commissioner cannot be disturbed on judicial review and must be affirmed.[60]

Having concluded that substantial evidence supports the ALJ's treatment of the opinions of the gastroenterologists, I find no reversible error with the ALJ's handling of the

---

[60] *Buxton*, 246 F.3d at 772.

-14-

medical expert, Frank Cox, M.D.  The objective medical evidence, as contained in the records of the treating sources, provides sufficient support for the residual functional capacity finding.  Dr. Cox's opinion at the first hearing, which is consistent with that finding, is cumulative.

The ALJ did not call a medical expert to testify at the second hearing, even though additional medical records were generated in the 18-month interval between the two hearings.  Perhaps the more prudent course would have been to have a medical expert testify at the second hearing.  But, as explained above, the records submitted at the second hearing support the conclusion, under substantial evidence review, that Kreider's condition remained stable despite some changes in her course of treatment.  The failure to elicit additional medical expert testimony, therefore, does not justify a remand.

## B.    The consulting psychiatrist

The ALJ gave the opinion of the consulting, examining psychiatrist, June Rees, M.D., little weight.[61]  Dr. Rees had assessed Kreider as having moderate to severe impairments in her ability to carry out work-related activities.[62]  The ALJ discounted this evaluation based upon the GAF score assigned by Dr. Rees to Kreider, inconsistencies between the evaluation and observations made during the examination, and Kreider's absence of treatment of her mental impairments.[63]

-----

[61] Tr. at 20.

[62] *Id.* at 374-75.

[63] *Id.* at 20.

-15-

The ALJ correctly notes that a GAF of 60, according to the DSM-IV-TR, is consistent with moderate as opposed to severe impairments[64] and that Kreider had not undergone any ongoing treatment for mental impairments.  Further, Dr. Rees recorded various observations inconsistent with severe impairments:

- "She is not dependent and takes care of most of her household needs."[65]

- "She understood the purpose of the evaluation, and was motivated to complete it without exaggerating or minimizing those signs of systems of which she is aware."[66]

- "Her speech was normal and right.  It was goal oriented and not rambling or circumstantial."[67]

- "There is no fragmentation of thinking or flight of ideas.  The words were coherent.  Associations were quite well organized most of the time.  There was no poverty of speech and no perseveration."[68]

- "Memory is good in all areas, and concentration today was fair, and this is the case in her daily life."[69]

- "Applicant does all the housework, ....  She does all the cooking without help.  She and her husband do the grocery shopping together."[70]

---

[64] Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition, Text Revision 2000) at 34.

[65] Tr. at 373.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] *Id.* at 374.

[70] *Id.* at 372.

-16-

Dr. Rees did a single examination. Drs. Ray and Meyers, who had extensive treating relationships with Kreider and were in a position to evaluate her mental, work-related capabilities in the context of her physical impairments, both concluded that Kreider was capable of low-stress work.[71]

Again, although the administrative record contains evidence going both ways as to the severity of Kreider's mental impairments, a reasonable person could conclude that the limitation to simple, repetitive, low-stress works adequately compensated for those impairments. Accordingly, the ALJ did not commit reversible error by assigning little weight to Dr. Rees's opinion regarding certain limitations.

## 3.     The ALJ's treatment of credibility

When a claimant presents pain as the cause of disability, the decision of the Sixth Circuit in *Duncan v. Secretary of Health and Human Services*[72] provides the proper analytical framework. The court in *Duncan* established the following test:

> [t]here must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.[73]

Under the first prong of this test, the claimant must prove by objective medical evidence the existence of a medical condition as the cause for the pain. Once the claimant has identified

---

[71] *Id.* at 558 (Dr. Ray); 681 (Dr. Meyers).

[72] *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986).

[73] *Duncan*, 801 F.2d at 853.

-17-

that condition, then under the second prong he or she must satisfy one of two alternative tests – either that objective medical evidence confirms the severity of the alleged pain or that the medical condition is of such severity that the alleged pain can be reasonably expected to occur.[74]

Objective medical evidence of pain includes evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption.[75] The determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals.[76] Both alternative tests focus on the claimant's "alleged pain."[77] Although the cases are not always clear on this point, this standard requires the ALJ to assume arguendo pain of the severity alleged by the claimant and then determine if objective medical evidence confirms that severity or if the medical condition is so bad that such severity can reasonably be expected.

A claimant's failure to meet the *Duncan* standard does not necessarily end the inquiry, however. As the Social Security Administration has recognized in a policy interpretation ruling on assessing claimant credibility,[78] in the absence of objective medical evidence

---

[74] *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994).

[75] *Id.* at 1037 (quoting 20 C.F.R. § 404.1529(c)(2)).

[76] *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

[77] *Duncan*, 801 F.2d at 853.

[78] Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483 (July 2, 1996).

sufficient to support a finding of disability, the claimant's statements about the severity of

his or her symptoms will be considered with other relevant evidence in deciding disability:

> Because symptoms, such as pain, sometimes suggest a greater severity of
> impairment than can be shown by objective medical evidence alone, the
> adjudicator must carefully consider the individual's statements about
> symptoms with the rest of the relevant evidence in the case record in reaching
> a conclusion about the credibility of the individual's statements if a disability
> determination or decision that is fully favorable to the individual cannot be
> made solely on the basis of objective medical evidence.[79]

The regulations also make the same point.

> We must always attempt to obtain objective medical evidence and, when it is
> obtained, we will consider it in reaching a conclusion as to whether you are
> disabled.  However, we will not reject your statements about the intensity and
> persistence of your pain or other symptoms or about the effect your symptoms
> have on your ability to work . . . solely because the available objective medical
> evidence does not substantiate your statements.[80]

The regulations set forth factors that the ALJ should consider in assessing credibility.

These include the claimant's daily activities; the location, duration, frequency, and intensity

of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side

effects of medication; and treatment or measures, other than medication, taken to relieve

pain.[81]

As a practical matter, in the assessment of credibility, the weight of the objective

medical evidence remains an important consideration.  Under the analytical scheme created

---

[79] *Id.* at 34484.

[80] 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

[81] 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii).

-19-

by the Social Security regulations for determining disability, objective medical evidence constitutes the best evidence for gauging a claimant's residual functional capacity and the work-related limitations dictated thereby.[82]  The regulation expressly provides that "other evidence" of symptoms causing work-related limitations can be considered if "consistent with the objective medical evidence."[83]  Where the objective medical evidence does not support a finding of disability, at least an informal presumption of "no disability" arises that must be overcome by such other evidence as the claimant might offer to support his claim.[84]

The specific factors identified by the regulation as relevant to evaluating subjective complaints of pain are intended to uncover a degree of severity of the underlying impairment not susceptible to proof by objective medical evidence.  When a claimant presents credible evidence of these factors, such proof might justify the imposition of work-related limitations beyond those dictated by the objective medical evidence.

The discretion afforded by the courts to the ALJ's evaluation of such evidence is extremely broad.  The ALJ's findings as to credibility are entitled to deference because he has the opportunity to observe the claimant and assess his subjective complaints.[85]  A court may not disturb the ALJ's credibility determination absent compelling reason.[86]

---

[82] *Cross*, 373 F. Supp. 2d at 732.

[83] 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

[84] *Cross*, 373 F. Supp. 2d at 732.

[85] *Buxton*, 246 F.3d at 773.

[86] *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).

-20-

An ALJ in a unified statement should express whether he or she accepts the claimant's allegations as credible and, if not, explain the finding in terms of the factors set forth in the regulation.[87]  If the ALJ rejects the claimant's complaints as incredible, he must clearly state his reasons for doing so.[88]  The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.[89]  The articulation should not be conclusory;[90] it should be specific enough to permit the court to trace the path of the ALJ's reasoning.[91]

As discussed above, under the substantial evidence standard, the objective medical evidence supports a conclusion that Kreider was not disabled.  A *Duncan* analysis of that objective medical evidence validates that conclusion.  The Commissioner does not dispute that Kreider had a medical condition, eosinophilic gastroenteritis, that can cause pain, satisfying the first prong of the *Duncan* test.  Under the second prong, the first alternative test – direct, objective medical evidence of pain – is not particularly applicable to Kreider's impairment because that impairment does not manifest itself in terms of reduced joint motion, muscle spasms, sensory deficits, or motor disruption.  As to the second alternative test – whether her condition is so severe that the alleged pain is reasonably expected to occur

---

[87] 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

[88] *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

[89] *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1054 (E.D. Wisc. 2005).

[90] SSR 96-7p, 61 Fed. Reg. at 34384.

[91] *Blom*, 363 F. Supp. 2d at 1054.

– the reports of her experts provide the answer.  Dr. Ray on numerous occasions observed that Kreider was doing well on medication, particularly Remicade, and that her condition was in remission.  As she described it, Kreider experienced pain when her disease was active,[92] and she can function when her disease was in remission.[93]  And her most recent treating gastroenterologist, Dr. Mcintyre,  reported that even without Remicade treatment for more than six months, Kreider's disease was not active.[94]  The *Duncan* analysis, therefore, does not justify setting aside the ALJ's findings.

As for credibility of subjective complaints, the ALJ did find Kreider not totally credible.[95]  He commented upon her testimony at the hearing[96] and inconsistencies between her testimony and the reports of Dr. Ray.[97]  He reviewed her medications, noted the success of the medication regimen prescribed by Dr. Ray and continued by Dr. Meyers, and observed that Kreider had minimal side effects from the medication.[98]  Further, he reviewed and commented upon her daily activities.[99]  In articulating on credibility, the ALJ need not

---

[92] Tr. at 557.

[93] *Id.* at 558.

[94] *Id.* at 668.

[95] *Id.* at 18-19.

[96] The ALJ's credibility assessment deserves deference because he had the opportunity to observe Kreider and to assess her subjective complaints.  *Buxton*, 246 F.3d at 773.

[97] *Id.*

[98] *Id.*

[99] *Id.* at 18.

discuss all of the factors set out in the regulations.[100]  In the context of this record, I conclude that the ALJ commented upon those factors most relevant here.  On balance, I find no compelling reason for disturbing the ALJ's credibility finding[101] and no ground for imposing greater limitations on Kreider's residual functional capacity based on her subjective complaints.

Kreider places substantial reliance on the Sixth Circuit's decision in *Rogers v. Commissioner of Social Security*.[102]  She argues that the ALJ's analysis of credibility here contravenes the analytical framework approved and applied in *Rogers*.  But *Rogers* is distinguishable in one very important respect – it is a fibromyalgia case.  As detailed in *Rogers*, fibromyalgia is a disease that evades diagnosis of its existence or severity by objective medical evidence.[103]  As such, objective medical evidence plays a minimal role in the evaluation of the claimant's work-related capabilities.[104]  The ALJ must rely heavily on the opinions of treating physicians, provided that the physicians have the requisite expertise, have done the proper evaluations, and have expressed opinions consistent with those evaluations.[105]  Furthermore, objective medical evidence becomes a minimal factor in the

---

[100] *Blom*, 363 F. Supp. 2d at 1054.

[101] *Smith*, 307 F.3d at 379.

[102] *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007).

[103] *Id.* at 243-46.

[104] *Id.*

[105] *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 991 (N.D. Ohio 2003).

credibility analysis.  As the *Rogers* court observed, because objective medical evidence is lacking in those suffering from fibromyalgia, it makes no sense to discount the subjective complaints of pain based on the absence of objective medical evidence.[106]

Here by contrast, Dr. Ray's records confirm that her disease was diagnosed by clinical testing, that her pain depended on whether her disease was active, and that the disease was well-controlled and in remission with medication.  As such, the objective medical evidence factors heavily into the credibility analysis and must be considered in testing the ALJ's findings as to credibility.

The *Rogers* court made another observation that is critical here.  In discussing the substantial evidence standard of review, it made clear that the ALJ should not be reversed merely because the claimant has more or better evidence in her favor.

> Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  In deciding whether to affirm the Commissioner's decision, it is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.[107]

Viewed in the context of a jury trial, all that is necessary to affirm is that reasonable minds could reach different conclusions on the evidence.  If such is the case, the Commissioner survives "directed verdict" and wins.  The court may not disturb the Commissioner's findings, even if the preponderance of the evidence favors the claimant.

---

[106] *Rogers*, 486 F.3d at 248.

[107] *Id.* at 241.

-24-

Kreider argues vigorously that the preponderance of the evidence supports her credibility.  But, as explained above, there is enough evidence in the record to "get the issue to the jury."  The Commissioner's decision, therefore, falls within the zone of choice in which the court may not interfere.[108]

**4.      The ALJ's treatment of the vocational expert's testimony**

Finally, Kreider argues that substantial evidence does not support the ALJ's finding that she is capable of her past relevant work or the alternative finding that a significant number of jobs existed locally or nationally that she could perform.  In support of this argument she posits that the vocational expert's testimony was inconsistent with the *Dictionary of Occupational Titles* ("DOT") and that the ALJ failed to address and resolve these inconsistencies, as required by the agency's ruling.

The VE testified that Kreider had past relevant work as a retail cashier (DOT 211.426-010) and a retail price marker (DOT 209.587-034).[109]  Both occupations were light and unskilled and had a specific vocational preparation ("SVP") rating of 2.[110]  In response to the ALJ's hypothetical; which incorporated limitations to simple, repetitive, low stress tasks; the VE opined that Kreider could do her past relevant work and identified bench assembler (DOT 706.684-022) and mail clerk (DOT 209.687-010) as jobs existing nationally

---

[108] *Buxton*, 246 F.3d at 772.

[109] Tr. at 162.

[110] *Id.* at 162. SVP is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  DOT Appendix C.

and locally in significant numbers that Kreider could perform.[111]  He also testified that need for convenient access to a bathroom would not change his answers.[112]  The ALJ did not ask the VE if his testimony was consistent with the DOT.[113]

The ALJ found Kreider capable of performing her past relevant work as a cashier.[114] Alternatively, he made a finding that she could perform the bench assembler and mail clerk jobs identified by the VE and that these jobs existed in significant numbers nationally and locally.[115]  The ALJ observed that the VE testified consistent with the DOT even though the ALJ has asked the VE no questions about such consistency.[116]

Social Security Ruling (SSR) 00-4p[117] requires an ALJ who takes testimony from a vocational expert about the requirements of a particular job to determine whether that testimony is consistent with the DOT.  The ruling's language expressly sets out the ALJ's affirmative duty:

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator *has an affirmative responsibility* to ask about any

---

[111] *Id.* at 162-63.

[112] *Id.* at 165.

[113] *Id.* at 161-70.

[114] *Id.* at 22.

[115] *Id.*

[116] *Id.*

[117] SSR 00-4p: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information In Disability Decisions, *available at* http://www.ssa.gov/OP_Home/rulings/di/02/SSR2000-04-di-02.html.

possible conflict between that VE or VS evidence and information provided in the DOT.  In these situations, the adjudicator will:

- Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

- If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.[118]

Here, despite a recitation in the decision that the VE's testimony was consistent with the DOT,[119] the ALJ did not inquire about such consistency during the hearing.[120]  The ALJ defaulted on the affirmative obligation imposed by the ruling.

The Commissioner seeks to have that default excused on two grounds.  First, the Commissioner argues that Kreider waived that default because her counsel did not ask the VE about inconsistencies at the hearing.  But as the Seventh Circuit reasoned in *Prochaska v. Barnhart*,[121] because the ruling imposes an affirmative duty on the ALJ to inquire, the claimant does not waive the defect by not raising it at the hearing.[122]  This is particularly so at step 5 of the sequential evaluation process where the Commissioner, not the claimant, bears the burden of proof.[123]

---

[118] *Id.*

[119] Tr. at 22.

[120] *Id.* at 161-70.

[121] *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006).

[122] *Id.* at 735.

[123] *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 545 (6th Cir. 2007).

Second, the Commissioner posits that harmless error can excuse the ALJ's duty to inquire about inconsistencies when in fact the VE's testimony does not conflict with the DOT.  This harmless error defense is well recognized.[124]  The Commissioner maintains that in fact the VE's testimony here is consistent with the DOT.

Kreider maintains that the jobs identified by the VE as suitable for her are not because either the SVP or the general educational development ("GED")[125] rating given by the DOT are beyond her capabilities.  The jobs that the ALJ found Kreider capable of doing, and the SVP and GED ratings for each, are as follows:

- Cashier retail          DOT 211.462-010          SVP 2          GED R3[126]
- Bench assembler          DOT 706.684-022          SVP 2          GED R2[127]
- Mail clerk          DOT 209.687-010          SVP 4          GED R3[128]

Specifically, Kreider submits that, under the ALJ's residual functional capacity finding and the hypothetical to the VE, she cannot do a job with an SVP rating in excess of 2 or a GED rating in excess of R1.

---

[124] *Id.* at 736; *Masters v. Astrue*, No. 07-123-JBC, 2008 WL 4082965, at *2 (E.D. Ky. Aug. 29, 2008); *Kelly v. Comm'r of Soc. Sec.*, No. 07-11824, 2008 WL 2950106, at *6 (E.D. Mich. July 31, 2008).

[125] General educational development "embraces those aspects of education (formal and informal) which are required of the worker for satisfactory job performance."  DOT Appendix C.

[126] 1 DOT at 183 (4th ed. 1991).

[127] 2 DOT at 694 (4th ed. 1991).

[128] 1 DOT at 181 (4th ed. 1991).

-28-

As for SVP rating, according to SSR 00-4p, a rating of 1 or 2 is unskilled, whereas 3 or 4 is semi-skilled.[129]  The ALJ rated Kreider as capable of unskilled work only.[130]  That would eliminate the mail clerk job, which is semi-skilled at SVP 4.  The VE erroneously testified that the mail clerk job was unskilled contrary to the DOT, which the ALJ failed to clarify.[131]

Kreider also argues that, under the DOT and the residual functional capacity finding, she cannot perform any of the jobs identified by the ALJ and the VE because they all have a DOT GED rating of R2 or above, and limitations found preclude any job with a GED rating above R1.

Although there is some authority supporting the position that a limitation to simple repetitive tasks eliminates any job with a GED rating of above R1, the majority of cases reject such a bright line rule.  The best explanation for rejecting such a rule is set forth in the decision in *Meissl v. Barnhart*, out of the Central District of California, wherein the court explained that a limitation to simple routine tasks does not necessarily equate with the DOT's GED R1 rating that encompasses the ability to perform simple one or two-step instructions:

> A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables ...." DOT at 1011.  Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question

---

[129] *Masters*, 2008 WL 4082965, at *2.

[130] Tr. at 22-22A.

[131] *Id.* at 164.

becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

Meissl focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, Meissl seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also*, 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

-30-

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938. Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See, Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005), holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart,* 91 Fed. Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir. 2004), "Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved – that is, not a high level of reasoning.

*Flaherty v. Halter*, 182 F. Supp. 2d 824, 850 (D. Minn. 2001).[132]

A number of courts, including two courts of appeals, have found on the facts presented compatibility between a limitation to simple repetitive tasks and a GED R2 rating.[133]

---

[132] *Meissl v. Barnhart*, 403 F. Supp. 2d 981, 983-85 (C.D. Cal. 2005).

[133] *Hackett v. Barnhart*, 395 F.3d 1168, 1176 (11th Cir. 2005); *Money v. Barnhart*, 91 F. App'x 210, 214-15 (3d Cir. 2004); *Adams v. Astrue*, No. CV07-1248, 2008 WL 2812835, at *3 (W.D. La. June 30, 2008); *Cooper v. Barnhart*, No. 04-222-P-S, 2005 WL 1231496, at *3 (D. Me. May 24, 2005).

-31-

Within this circuit, the Eastern District of Kentucky recently rejected the position that a limitation to simple repetitive tasks precludes a claimant from jobs with a GED rating of R2 and that VE testimony identifying such jobs as existing for a person with such a limitation creates an inconsistency with the DOT under SSR 00-4p.[134]

Even though I reject Kreider's bright line rule argument, that does not resolve the matter on the record in this case.  The ALJ adopted a limitation to simple repetitive tasks **and low stress work.**[135]  He incorporated that limitation in his hypothetical to the VE.[136]  The additional limitation to low stress work may take Kreider's capabilities outside of GED R2.

In a recent opinion, the Eastern District of Michigan reversed a no disability decision on the grounds of failure to address inconsistency with the DOT under SSR 00-4 where the limitation adopted included no fixed or rigid production demands.[137]  Given that limitation, the court held that it could not determine on the record if the jobs identified by the VE, all of which had a GED rating of R2, were ones the claimant could do.[138]  Because the ALJ had defaulted on his obligation to inquire about such inconsistencies on the record, the court remanded the case.

---

[134] *Masters*, 2008 WL 4082965, at *3.

[135] Tr. at 18.

[136] *Id.* at 163.

[137] *Stine v. Comm'r of Soc. Sec.*, No. 07-12301, 2008 WL 1837357 (E.D. Mich. Apr. 23, 2008).

[138] *Id.*, at *5.

Here the GED rating of R3 eliminates the retail clerk and mail clerk[139] positions identified by the ALJ and the VE.  Without the former, the finding that Kreider can perform her past relevant work as a retail clerk fails for want of substantial evidence.

The ALJ's alternative finding at step 5 hangs on the bench assembler's job, which has a GED rating of R2.  Although Kreider could do this job consistent with the DOT if she was merely limited to simple repetitive work, it cannot be determined from the record if she can do it with the additional limitation to low stress work.  Having failed to inquire of the VE about consistency of his testimony with the DOT in this regard, this alternative finding lacks the support of substantial evidence.  This case should be remanded on this narrow point.

## Conclusion

Based on the foregoing analysis, I recommend the reversal of the decision of the Commissioner denying Kreider's applications for disability insurance benefits and supplemental security income and the remand of the decision for reconsideration of whether Kreider could perform her past relevant work and/or whether a significant number of jobs exists locally and nationally that Kreider could perform.

Dated:  February 24, 2009                             s/ William H. Baughman, Jr.

United States Magistrate Judge

---

[139] The SVP 4 rating for this job also renders it unsuitable to Kreider's capabilities as found by the ALJ.

-33-

**Objections**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.[140]

---

[140] *See*, *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also*, *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).